United States District Court
Southern District of Texas
**ENTERED**

January 23, 2025
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **JOHN HARGETT,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **Civil Case No. 4:22-CV-01851** |
| | § | |
| **PHILLIPS 66 COMPANY,** | § | |
| | § | |
| **Defendant.** | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

John Hargett walked into work for years knowing that his legs were slowly betraying him. Hargett has hereditary spastic paraplegia, an inherited disorder that causes progressive weakness and stiffness in the legs. The disease made daily tasks challenging, but Hargett succeeded at his job with Phillips 66 despite these limitations. Then, twenty years into his tenure with Phillips 66, a change in company policy purportedly transformed Hargett's disability from inconvenient to insurmountable. Facing termination, Hargett sued Phillips 66 under the Americans with Disabilities Act to keep his job.

Pending before the Court is Phillips 66's Motion for Summary Judgment, (Dkt. No. 26), and Motion to Strike Plaintiff's Summary Judgment Evidence, (Dkt. No. 31). For the following reasons, the Court **GRANTS in part** and **DENIES in part** Phillips 66's Motion for Summary Judgment, (Dkt. No. 26), and **DENIES** Phillips 66's Motion to Strike Plaintiff's Summary Judgment Evidence, (Dkt. No. 31).

## I.     BACKGROUND[1]

Defendant Phillips 66 is a large energy company specializing in the "downstream"—or post-extraction—part of the oil-and-gas industry.  (*See* Dkt. No. 26-1 at 2).  It refines crude oil into usable products (like gasoline or diesel) and markets and distributes them.  (*See id.*).  Phillips 66 operates several refineries, including the Sweeny Refinery in Texas.  (*Id.*).  The Sweeny Refinery has several facilities, including the Coker Unit.  (*Id.*).

Phillips 66 hired Plaintiff John Hargett in August 2000 as a tank car operator at the Sweeny Refinery.  (Dkt. No. 30-2 at 2).  Three years later, Hargett transferred to an operator position in Sweeny's Coker unit.  (*Id.*).  Hargett originally worked as an outside operator, which required him to work outdoors and perform manual tasks that included "bending, stooping, climbing, lifting, and other physical tasks."  (*Id.*).  According to Phillips 66, Hargett was required to climb ladders, tanks, and towers; take samples or readings of various process streams; work in enclosed spaces such as tanks and silos; climb up to 250 feet in height; lift up to 50 pounds; and work outside in the field in harsh weather conditions.  (Dkt. No. 26-4 at 2–3).

In 2007, Hargett was diagnosed with hereditary spastic paraplegia.  (Dkt. No. 30-2 at 2).  This genetic disease affects the ability to walk due to progressive stiffness and leg weakness.  Major symptoms include muscle stiffness (spasticity) and weakness in the

---

[1]     Except where noted, this Section contains only undisputed facts, and all facts and reasonable inferences have been construed in favor of the nonmovant.  *Renfroe v. Parker*, 974 F.3d 594, 599 (5th Cir. 2020).  The Court has not weighed evidence or made credibility findings.  *Id.*

lower limbs (paraplegia).  (*See id.*).  Over time, people with spastic paraplegia have increasing difficulty walking because their muscles become tight, and they lose some control over leg movements.  (*See id.* at 2–3).  The severity of these symptoms can differ: some people might have mild symptoms and experience only slight difficulty walking as they age; others might need walking aids like a cane or wheelchair.  *See Hereditary Spastic Paraplegia*, NHS (Feb. 14, 2023), [https://www.nhs.uk/conditions/hereditary-spastic-paraplegia](https://www.nhs.uk/conditions/hereditary-spastic-paraplegia) [[https://perma.cc/JQ5B-H2QR](https://perma.cc/JQ5B-H2QR)].  After being diagnosed, Hargett "began to suffer from stiffness but was able to continue work in the outside operator position without accommodation."  (Dkt. No. 30 at 6) (citing Dkt. No. 30-2 at 3).

After a few years, Phillips 66 transferred Hargett to an inside console operator's job, which "did not require [Hargett] to work outside or engage in any physical activity." (Dkt. No. 30-2 at 2).  As an inside console operator, Hargett "worked at the console board, monitoring outside activities and trouble shooting problems by monitoring the outside operators on several screens."  (*Id.*).  Phillips 66 required indoor console operators to remain certified in "multiple operator jobs" in case of any "unforeseen events," like an employee's absence or reassignment.  (Dkt. No. 26-1 at 2–3).  Hargett was able to maintain these certifications by working only the indoor operator job.  (Dkt. No. 26-2 at 30). Although Hargett's symptoms got worse, ultimately requiring the use of a cane to help him walk, he appeared to have found his fit as an indoor console operator.  (Dkt. No. 30-2 at 3).

In 2020, Phillips 66 conducted a corporate health, safety, and environment compliance audit at the Sweeny Refinery.  (Dkt. No. 26-1 at 3).  The audit committee found "non-conformance" and made recommendations "to meet the requirements for conformance."  (*Id.*).  In particular, the audit committee recommended that indoor console operators work the outdoor jobs "a minimum of 12 hours every 6 months" to maintain their certification for those positions.  (Dkt. No. 26-9 at 2).  Following this audit, the Sweeny Refinery updated its "Operations Training Process" manual to require operators to "[w]ork each Outside Job" a minimum of "twelve (12) hours every six (6) months."  (Dkt. No. 26-10 at 12–13).  This update differed from the old guidelines, which required operators to work only "**one job** within the Job Family [a group of jobs for which job duties are similar or integrated . . . ]."  (Dkt. No. 26-7 at 11–12).  Put simply, where before Hargett could retain his outdoor certifications by working only the indoor console, he would not be required to perform the outdoor jobs too.

Following the policy updates, Hargett's supervisor, Joseph Lee Niemann, gave Hargett an Employee Health Report for his doctor to complete.  (Dkt. No. 30-2 at 3).  According to Hargett, within two hours of submitting the completed report, Hargett was told by Niemann that he was going to have to go on FMLA "because Phillips 66 couldn't approve any accommodation."  (Dkt. No. 30-2 at 3).  Hargett submitted the medical report to an Occupational Health Nurse, who sent an email to Niemann asking whether Hargett's work restrictions could be accommodated.  (*See* Dkt. No. 26-13 at 2).  Niemann responded that, "[b]ased on these restrictions, I cannot accommodate any restricted duty

for [Hargett].  His restrictions prevent him from all duties associated with the operator position, including working in the [console job]."  (*Id.*).

Phillips 66 placed Hargett on paid leave under the FMLA.  (Dkt. No. 26-3 at 2).  After exhausting FMLA leave, Hargett was put on short- and long-term disability.  (*See* Dkt. Nos. 26-15, 26-16, 26-17).  During Hargett's leave, Phillips 66 revoked Hargett's job certifications for the outdoor jobs because he had been absent from his job for longer than six months, and therefore had not worked the jobs for at least twelve hours every six months as required by "Corporate and Site training requirements."  (Dkt. No. 26-8 at 2).  Phillips 66 also told Hargett that employees are permitted only to stay on leave for up to twenty-four months under company policy.  (Dkt. No. 26-2 at 53).  Therefore, Phillips 66 advised Hargett that "if he had not returned to work by the end of the 24-month period, his employment would be terminated."  (Dkt. No. 26 at 12) (citing Dkt. No. 26-2 at 53).[2]

Hargett sued Phillips 66 on June 6, 2022, for "willful violation of the Americans with Disabilities Act," 42 U.S.C. § 12101 *et seq.*, alleging intentional discrimination and refusal-to-accommodate, (Dkt. No. 1 at 1, 3).  Phillips 66 answered, (Dkt. No. 11), and moved for summary judgment on January 23, 2024, (Dkt. No. 26).  Hargett opposed Phillips 66's motion, (Dkt. No. 30), and Phillips 66 moved to strike the evidence Hargett presented in support of his response, (Dkt. No. 31).

---

[2]    Phillips 66 asserts that "[t]o date, Hargett remains employed by Phillips 66."  (Dkt. No. 26 at 14) (citing Dkt. No. 26-2 at 51).  Hargett's deposition testimony is that, while his "name is on the payroll," Phillips 66 does not pay or otherwise compensate him.  (Dkt. No. 26-2 at 51).

For the following reasons, the Court grants Phillips 66's Motion for Summary Judgment with respect to Hargett's intentional discrimination claims, denies Phillips 66's Motion with respect to Hargett's failure-to-accommodate claims, and denies Phillips 66's Motion to Strike Plaintiff's Summary Judgment Evidence.

## II.    LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could affect the suit's outcome under governing law. *Renwick v. PNK Lake Charles, LLC*, 901 F.3d 605, 611 (5th Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). And "[a] dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *TIG Ins. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying the record evidence that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).

If the movant meets this burden, the nonmovant must come forward with specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c); *see also Matsushita Elec. Indus.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The nonmovant must "'go beyond the pleadings and by [the nonmovant's] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Nola Spice Designs, LLC v. Haydel Enters.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553). "The nonmovant must 'identify specific evidence in the record and . . . articulate the precise manner in which that evidence supports his or her claim.'" *Carr v. Air Line Pilots Ass'n, Int'l*, 866 F.3d 597, 601 (5th Cir. 2017) (per curiam) (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)), *as revised* (July 14, 2017). If evidence is merely colorable or not significantly probative, summary judgment is appropriate. *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019) (citing *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511).

In reviewing a motion for summary judgment, the district court views the evidence in the light most favorable to the nonmovant. *Carr*, 866 F.3d at 601. This means that courts must resolve factual controversies in the nonmovant's favor, "but only when . . . both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075.

## III.    DISCUSSION

### A.    EVIDENTIARY RULINGS

In its Motion to Strike Plaintiff's Summary Judgment Evidence, (Dkt. No. 31), Phillips 66 objects to three documents submitted in support of Hargett's Amended Response to Defendant's Motion for Summary Judgment, (Dkt. No. 30): <u>*Exhibit A*</u>, the

Declaration of John Hargett, (Dkt. No. 30-2); *Exhibit B*, the Declaration of Nick Bess, (Dkt. No. 30-3); and *Exhibit C*, the Declaration of Brent Michaels, (Dkt. No. 30-4). Phillips 66 objects that "the declarations are incompetent summary judgment evidence, as the majority of the statements they offer are . . . without proper foundation, not based on personal knowledge, and/or speculative," or based on "inadmissible hearsay." (Dkt. No. 31 at 1, 3–4). Therefore, Phillips 66 requests that the Court strike the "evidence in whole, or in the alternative, strike the identified portions" of the contested evidence. (*Id.* at 5). For the reasons below, the Court denies Phillips 66's motion.

First, Phillips 66 does not explain how the contested statements are "unsupported, unsubstantiated, lack foundation and are not based on . . . personal knowledge, and constitute mere speculation, conclusory allegations, and/or inadmissible hearsay." (*Id.* at 3–4). Indeed, beyond referencing Rule 56 of the Federal Rules of Civil Procedure in its Standard of Review, Phillips 66's Motion to Strike does not state any rules of evidence or procedure that the statements allegedly violate or provide any analysis explaining why they are inadmissible. (*See id.* at 1–5). Accordingly, Phillips 66 has not properly presented these objections for review. *See* Fed. R. Evid. 103(a)(1)(B); *see Michel v. Workrise Techs. Inc.*, No. 1:21-CV-00681, 2024 WL 2948646, at *8 (W.D. Tex. June 11, 2024) ("[C]ourts within the Fifth Circuit have held that boilerplate objections like Plaintiffs', virtually devoid of any law or analysis, should be overruled as a whole.") (collecting cases).

Second, most of the objected-to statements do not create a genuine issue of material fact, even if considered. The statements in (1) *Exhibit B*, Declaration of Nick Bess, (Dkt. No. 30-3), and (2) Paragraphs 3, 5, and 8 of *Exhibit C*, Declaration of Brent Michaels,

(Dkt. No. 30-4), do not raise a genuine issue of material fact for Hargett's disparate treatment claim and offer limited probative value to his reasonable accommodation claim. The Court would reach the same conclusions even if these statements were not considered. Therefore, Phillips 66's request to strike these statements would be denied in any case as moot.

Third, the remaining statements—those in *Exhibit A*, Declaration of John Hargett, (Dkt. No. 30-2), and Paragraphs 4, 6, 7, and 9 of *Exhibit C*, Declaration of Brent Michaels, (Dkt. No. 30-4)—are admissible summary-judgment evidence for the reasons explained below.

The statements in *Exhibit A*, Declaration of John Hargett, (Dkt. No. 30-2), and Paragraphs 4, 6, 7, and 9 of *Exhibit C*, Declaration of Brent Michaels, (Dkt. No. 30-4) are admissible. "[A]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Hager v. Brinker Tex., Inc.*, 102 F.4th 692, 702 (5th Cir. 2024). At the summary judgment stage, while "evidence relied upon need not be presented in an admissible form, . . . it must be 'capable of being presented in a form that would be admissible in evidence.'" *Id.* (quoting *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 208 (5th Cir. 2018)) (internal citations omitted).

Because Rule 56(c)(4) mandates that "the judge should consider any material that would be admissible at trial, the rules of evidence and their exceptions determine what allegations the affidavit may contain. Questions regarding admissibility at trial are

determined in the federal courts by the Federal Rules of Evidence . . . ."  10B Charles Alan Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 2738 (4th ed. June 2024 update).

Here, Phillips 66 appears to object to the exhibits under Rules 602 and 802.  (*See* Dkt. No. 31 at 1, 3–4 (objecting to the statements as "not based on personal knowledge" and as "inadmissible hearsay")).

Rule 602 requires a witness to introduce evidence "sufficient to support a finding that the witness has personal knowledge of the matter."  Fed. R. Evid. 602.  "Evidence to prove personal knowledge may consist of the witness's own testimony."  *Id.*  "'Personal knowledge can include inferences and opinions, so long as they are grounded in personal observation and experience.'"  *United States v. Evans*, 892 F.3d 692, 715 (5th Cir. 2018) (quoting *United States v. Cantu*, 167 F.3d 198, 204 (5th Cir. 1999)), *as revised* (July 6, 2018).  And trial courts have "some discretion" in evaluating "an initial showing [of a witness's personal knowledge], and generally [do] not abuse that discretion by accepting as provisionally adequate [a] witness' testimony that he has personal knowledge."  *United States v. Davis*, 792 F.2d 1299, 1304 (5th Cir. 1986).  That is particularly true "when other evidence indicates that the witness had a personal connection to the subject matter, [and] there is nothing to suggest that the witness likely did not have or could not have had such knowledge."  *Id.*

Rule 802 prohibits the introduction of hearsay evidence, which generally includes statements made out of court offered "to prove the truth of the matter asserted."  Fed. R. Evid. 801(c); Fed. R. Evid. 802.  But Rule 802 does not prohibit statements made by an

10

opposing party. *See* Fed. R. Evid. 801(d)(2). "Rule 801(d)(2)(D) provides that a statement is not hearsay when it is 'offered against an opposing party' and 'was made by the party's agent or employee on a matter within the scope of that relationship and while it existed.'" *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 966–67 (5th Cir. 2016) (quoting Fed. R. Evid. 801(d)(2)(D)). The Fifth Circuit has noted that to qualify for this exception, the declarant must be involved in the decision-making process affecting the employment action involved. *Id.* at 967 (quoting *Staheli v. Univ. of Miss.*, 854 F.2d 121, 127 (5th Cir. 1988)); *Lay v. Singing River Health Sys.*, 694 F.App'x 248, 257 (5th Cir. 2017) (per curiam) (quoting *Kelly ex rel. All Heirs at Law of Kelly v. Labouisse*, No. 3:07-CV-00631, 2009 WL 427103, at *3 (S.D. Miss. 19 Feb. 2009), *aff'd sub nom. Kelly v. Labouisse*, 364 F.App'x 895 (5th Cir. 2010)); *see also Ramirez v. Gonzales*, 225 F.App'x 203, 210 (5th Cir. 2007) (per curiam).

### 1.   *Exhibit A*, Declaration of John Hargett

The statements in *Exhibit A*, the Declaration of John Hargett, (Dkt. No. 30-2), are admissible. Four of the five contested paragraphs only include information based on Hargett's knowledge or experience, including (1) that Phillips 66 required Hargett to take FMLA leave in 2021, followed by short- and long-term disability; (2) that Hargett was subsequently required to file for Social Security Disability; and (3) what Hargett included in his Social Security Disability application. (*See* Dkt. No. 31 at 3) (quoting Dkt. No. 30-2 at 2–3). Hargett has personal knowledge of these events.

The evidence also sufficiently supports a finding that Hargett knew that his supervisor, Lee Niemann, (Dkt. No. 26-2 at 32), "was aware of [Hargett's] disability and the fact that [he] was working despite [his] limitations," (Dkt. No. 30-2 at 3). In his

deposition, Hargett explains that he told Niemann about his disability. (Dkt. No. 26-2 at 64–65). And, as Phillips 66 acknowledges, on August 5, 2021, an Occupational Health Nurse "sent an email to Niemann outlining Hargett's physical work restrictions," to which Niemann responded by affirming that he knew of and understood Hargett's disability and resulting physical limitations. (Dkt. No. 26 at 11). Because the statements in Exhibit A, (Dkt. No. 30-2), are supported by Hargett's personal experience and information available to Hargett, they are admissible.[3]

### 2.    _Exhibit C_, Declaration of Brent Michaels

The statements made in Paragraphs 4, 6, 7, and 9 of _Exhibit C_, the Declaration of Brent Michaels, (Dkt. No. 30-4), are also admissible. They are based on conversations Michaels had with Lee Niemann and Scott Lindsey. Therefore, the knowledge gained from these conversations is based on Michaels's personal knowledge. _See_ Fed. R. Evid. 602.

As to Niemann's and Lindsey's statements to Michaels, those statements are admissible under Rule 801(d)(2)(D) as an opposing party's statement made by a Phillips 66 employee "on a matter within the scope" of that employment relationship while it existed. Fed. R. Evid. 801(d)(2)(D); _see MetroplexCore, LLC v. Parsons Transp., Inc._, 743 F.3d 964, 978–79 (5th Cir. 2014) (per curiam) (noting that statements of an "agent or employee" of a party to the action that were within scope of employee's employment fell under

---

[3]    Phillips 66 also objects to "inadmissible hearsay" with respect to _Exhibit A_, (Dkt. No. 31 at 3), but Phillips 66 does not explain which statements violate Rule 801 or how. Therefore, Phillips 66's hearsay objections to _Exhibit A_ are overruled.

801(d)(2)(D)).  Niemann, as Team Leader, was responsible for ensuring that operators "work on a job on which they are certified," (Dkt. No. 26-2 at 32), and made the disputed statements while conducting a meeting regarding the updated certification requirements, (Dkt. No. 30-4 at 2).  Additionally, as the Phillips 66 supervisor who stated that Hargett's physical work restrictions (1) could not be accommodated and (2) "prevent[ed] him from all duties associated with the operator position, including . . .[the console job]," (Dkt. No. 26-13 at 2); (Dkt. No. 26-18 at 2), Niemann was involved in the decision-making process affecting Hargett's removal, *see Dunn v. Hunting Energy Servs.*, 288 F.Supp.3d 749, 779 (S.D. Tex. 2017) (holding that supervisors' statements fell under 801(d)(2)(D) when made within scope of the supervisor's employment and related to a relevant employment decision).

Similarly, Scott Lindsey was an "Operations Excellence [specialist] and Hargett's supervisor" when he made the disputed statement.  (Dkt. No. 30-4 at 2).  As an operations excellence specialist, he was "responsible for, among other things, reviewing and revising policies and procedures, including the training process at the Sweeny Refinery."  (Dkt. No. 26-1 at 2).  He specifically "worked on updating and implementing Revision 9 of the Training Process at the Sweeny Refinery."  (*Id.* at 3).  Lindsey made the disputed statement in response to a question about what would happen to Hargett under Revision 9 because of his physical disabilities.  (Dkt. No. 30-4 at 2) ("Lindsey told me that they would give Hargett an exemption because of his physical restrictions."); (Dkt. No. 26-1 at 3).  Because Lindsey was Hargett's supervisor and the individual in charge of implementing the Revision 9 updates, Lindsey's statement about what would happen to

Hargett under the updates also constitutes an admission by a party opponent under Rule 801(d)(2)(D).  *See Dunn*, 288 F.Supp.3d at 779.

Finally, the information contained in Paragraph 9 is admissible regardless of the objection, because the statement is supported by other admissible evidence.  *See Lee v. Offshore Logistical & Transp., LLC*, 859 F.3d 353, 355 (5th Cir. 2017) ("'Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . , the material may be presented in a form that would not, in itself, be admissible at trial.'" (quoting 11 Moore's Federal Practice–Civil ¶ 56.91 (2017)), *as revised* (July 5, 2017).  In Paragraph 9, Michaels asserts that "[Lee] Niemann, upon receiving the Doctor's restrictions, removed Hargett from his job and placed him on FMLA [leave]."  (Dkt. No. 30-4 at 3).  Phillips 66 does not dispute that on August 5, 2021, an Occupational Health Nurse "sent an email to Niemann outlining Hargett's physical work restrictions," and Niemann responded by stating that Hargett could no longer work the indoor console position because of his physical limitations.  (Dkt. 26 at 11); (Dkt. No. 26-13 at 2); (Dkt. No. 26-18 at 2).  Because there is admissible evidence supporting the facts in Paragraph 9, any objection to Paragraph 9 is overruled.

## B.    APPLICABILITY OF THE ADA

Under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, a "covered entity" may not "discriminate against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  So the employee must first show that the employer is a "covered entity," and that the employee is a "qualified individual" under the ADA.  *Id.*  Then, the claimant must show that the employer actually violated the ADA by

(1) discriminating against the employee (2) *because of* the employee's disability.  *See* 42 U.S.C. § 12112(a) (prohibiting discrimination against an individual "*on the basis of*" that individual's disability (emphasis added)).  This proof of a "causal connection" is at the heart of employment litigation, and employees may prove this connection through several theories, including—as here—showing disparate treatment or a failure to accommodate.  Gerald E. Rosen et al., Rutter Group Practice Guide: Federal Employment Litigation ch. 2-G § 2:345–46, ch. 4-A § 4:783 (July 2024 update).

Courts analyze these two theories under separate frameworks.  Therefore, "[a]lthough their methods of proof are related, 'a failure-to-accommodate claim under the ADA is distinct from a claim of disparate treatment.'"  *King v. DFW Int'l Airport Bd.*, No. 23-11084, 2024 WL 4132676, at *4 (5th Cir. Sept. 10, 2024) (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 703 n.6 (5th Cir. 2014)).  "To establish a prima facie disparate-treatment claim, 'a plaintiff must prove: (1) that he has a disability; (2) that he was qualified for the job; [and] (3) that he was subject to an adverse employment decision on account of his disability.'"  *Id.* (alteration in original) (quoting *LHC Grp.*, 773 F.3d at 697).  To state a failure-to-accommodate claim, a plaintiff must show that (1) he is a qualified individual with a disability; (2) the employer knew of the disability and its relevant limitations; and (3) the employer failed to make reasonable accommodations for these known limitations.  *Id.* (quoting *Feist v. La. Dep't of Just.*, 730 F.3d 450, 452 (5th Cir. 2013)).

In both claims, a plaintiff must prove that he is disabled under the ADA and qualified for the job.  But in a disparate treatment claim, the plaintiff must further prove that he was subject to an adverse-employment decision because of his disability, *see id.*

15

(quoting *LHC Grp.*, 773 F.3d at 697), while "[a] failure-to-accommodate claim 'provides a mechanism to combat workplace discrimination even when the employee in question *has not* suffered [an] adverse employment action,'" *id.* (emphasis and alteration in original) (quoting *LHC Grp.*, 773 F.3d at 703 n.6).[4]   Consequently, in a failure-to-accommodate claim, the employee need only show that the employer failed to make reasonable accommodations for the limitations of which the employer was aware.  *Id.* (quoting *Feist*, 730 F.3d at 452).

The Court begins its analysis by examining whether Hargett has met his burden of establishing that the ADA applies to his claims.  The Court then considers both of Hargett's theories purporting to show that discrimination occurred, beginning with Hargett's claim that he can show disparate treatment discrimination and concluding with Hargett's claim that Phillips 66 failed to accommodate Hargett's known disabilities.

### 1.   <u>Qualified Employee</u>

The ADA only protects "qualified individual[s]" from discrimination against "covered entit[ies]."  42 U.S.C. § 12112(a).  The Parties do not dispute that Phillips 66 is a "covered entity."   Therefore, the Court begins by assessing whether Hargett is a "qualified employee" under the ADA.

"The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the *essential functions* of the employment

---

[4]   That said, "an employer's failure to accommodate an employee's disability can still be relevant to a disparate treatment claim."  *King v. DFW Int'l Airport Bd.*, No. 23-11084, 2024 WL 4132676, at *4 (5th Cir. Sept. 10, 2024).  Specifically, "whether an employer could reasonably accommodate an employee is pertinent to whether a plaintiff was qualified for a position."  *Id.*

position that such individual holds or desires."  42 U.S.C. § 12111(8) (emphasis added).

"'Essential functions' are 'fundamental', as opposed to 'marginal' job duties, such that a

job is 'fundamentally alter[ed]' if an essential function is removed."  *Credeur v. Louisiana*,

860 F.3d 785, 792 (5th Cir. 2017) (alteration in original) (internal citations omitted) (first

quoting 29 C.F.R. § 1630.2(n)(l); and then quoting 29 C.F.R. § Pt. 1630, app. at 397).

"Fact-finders must determine whether a function is 'essential' on a case-by-case basis."

*Id.* (quoting *LHC Grp.*, 773 F.3d at 698).

In determining the "essential functions" of a job, the ADA mandates that

"consideration shall be given to the employer's judgment as to what functions of a job

are essential, and if an employer has prepared a written description before advertising or

interviewing applicants for the job, this description shall be considered evidence of the

essential functions of the job."  42 U.S.C. § 12111(8).  The Equal Employment Opportunity

Commission ("EEOC") has promulgated seven non-exhaustive factors to guide this

essential-function inquiry:

> (i)    The employer's judgment as to which functions are
>        essential;
>
> (ii)   Written job descriptions prepared before advertising
>        or interviewing applicants for the job;
>
> (iii)  The amount of time spent on the job performing the
>        function;
>
> (iv)   The consequences of not requiring the incumbent to
>        perform the function;
>
> (v)    The terms of a collective bargaining agreement;
>
> (vi)   The work experience of past incumbents in the job;
>        and/or
>
> (vii)  The current work experience of incumbents in similar
>        jobs.

29 C.F.R. § 1630.2(n)(3); *see Credeur*, 860 F.3d at 792.  The statute and regulations indicate that courts must give the greatest weight to the "employer's judgment," particularly if the employer has prepared a written job description for the purpose of "advertising" the position or "interviewing" applicants for it.  *See Credeur*, 860 F.3d at 792.  Therefore, the Court begins with Phillips 66's position.

Phillips 66 contends that performing the outdoor jobs is an "essential function" of the console operator position.  (Dkt. No. 26 at 15–16).  Phillips 66 has not provided any written job description used for advertising or interviewing to support its assertion. Instead, Phillips 66 rests its argument almost entirely on a company document that "outlines guidelines for Certification of Sweeny Complex Operators" and was recently updated to require operators to work outside jobs to maintain their certifications.  (Dkt. No. 26-10 at 12–13).  Though the Court affords Phillips 66's judgment great weight, the company handbook—alone—is not enough to support this conclusion at the summary judgment stage.

First, arguments based exclusively on the policy manual are circular.  Before the revision of the handbook, working the outside jobs was not required for the console job; they were not "essential."  (*See* Dkt. No. 26 at 8–9) (noting that before Revision 9 operators were not required to work outdoor jobs).  Phillips 66 argues that when the policy changed, the outside jobs became an essential job function of the console job, and they are an essential job function now just because they are listed in the new policy.  (*See id.* at 9–10, 15–16).  It is certainly possible that the console job has fundamentally changed so that working the outside jobs is now "essential" when it was not before.  But absent such

evidence, it is unpersuasive to argue that a responsibility that was not mandated or enforced for over a decade is now "essential" solely because it appears in a company policy manual, and that it is in the company policy manual because it is now essential.

Second, the company handbook is inadequate proof because it does not provide a meaningful way of distinguishing a job's "essential" functions from the rest. A qualified individual need not show that they can perform every task in a corporate policy handbook or that is asked of them; they need only be able to perform those "'*fundamental*'" to a position. *Credeur*, 860 F.3d at 792 (internal citations omitted) (emphasis added) (quoting 29 C.F.R. § 1630.2(n)(l)).

Phillip's 66's reliance on its handbook to define "essential" job functions is also flawed for several other reasons. First, by its very nature, a company handbook lists all tasks expected of an employee, regardless of their significance. Its purpose is not to distinguish between fundamental and nonessential tasks. If we accept Phillips 66's premise that anything listed in the handbook is "essential," it is impossible to identify any task that is *not* essential.

Second, labeling every task in a company handbook as "essential" is out of step with Fifth Circuit precedent, which limits essential job functions to the fundamental, basic duties of the position. *Cuellar v. GEO Grp., Inc.*, No. 22-50135, 2023 WL 4535079, at *2 (5th Cir. July 13, 2023); *compare, Weber v. BNSF Ry. Co.*, 989 F.3d 320, 325 (5th Cir. 2021) ("[T]here is a general consensus among courts, including ours, that regular work-site attendance is an essential function of most jobs."); *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 584, 548 n.54 (5th Cir. 2020) ("[M]aintaining consciousness is a basic element of

any job" as is "physical presence" at work); *Hypes ex. rel. Hypes v. First Com. Corp.*, 134 F.3d 721, 727 (5th Cir. 1998) (per curiam) (collecting cases holding "that regular attendance is an essential function of most jobs") *with LHC Grp.*, 773 F.3d at 697 (finding factual dispute as to "whether driving was an essential function" of employee's position); *Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 683 (5th Cir. 1996) (finding factual dispute about whether "meeting milestone deadlines is essential to the position of a systems engineer").

For these reasons, the Court looks beyond Phillips 66's handbook to evaluate which tasks are genuinely essential to the job and which are not. *Credeur*, 860 F.3d at 794 ("[C]ourts should not give blind deference to an employer's judgment, but should instead evaluate the employer's words alongside its policies and practices."); *LHC Grp.*, 773 F.3d at 698. To this end, the remaining five EEOC regulations direct courts to consider whether a function is essential by examining "circumstantial evidence of an employer's policies *and practices* pointing to a function being essential, or not." *Credeur*, 860 F.3d at 794 (emphasis added) (citing 29 C.F.R. § 1630.2(n)(3)(iii)–(vii)). Here, the summary-judgment evidence weighs against Phillips 66's contention that the outside jobs are essential for the indoor console position.[5]

a.   The amount of time spent on the job performing the function

Before the new policy, operators like Hargett were not required to spend any time performing the outdoor jobs, and the summary-judgment evidence shows that they did not. (*See* Dkt. No. 26 at 7–9); (Dkt. No. 26-2 at 29–30). Even under the new policy,

---

[5]   The Parties have not presented evidence of a collective-bargaining agreement, so the Court excludes this factor from consideration.

operators are only required to spend twelve hours every six months on the outdoor jobs. (Dkt. No. 26-10 at 12–13).  A standard forty-hour workweek would mean that a console operator would spend less than 2% of their time annually on each outdoor job.  And even considering the time required for all four outdoor jobs, (Dkt. No. 26-2 at 35), an employee would still spend less than 5% of their time annually on them.

While the Court is not suggesting that there is a percentage threshold requirement for a function to be essential, when a task constitutes a tiny fraction of an employee's time at work, the "amount of time spent on the job performing the function" weighs against a finding that the function is "essential" to that job.  That is the case here.

> b.    The consequences of not requiring the incumbent to perform the function

Phillips 66 argues that console operators must maintain their certifications for the outdoor jobs because, "in the event of any unforeseen events such as an employee's absence or an employee's reassignment from a regularly assigned job to address other business needs," a console operator may need to fill an outside position.  (Dkt. No. 26-1 at 2–3); (Dkt. No. 26-2 at 25).  "This job rotation is essential because operators must have a current working knowledge of all their operator jobs, including the equipment, to minimize the inherent risks associated with operating refineries, including industrial accidents such as fire and explosion."  (Dkt. No. 26-1 at 2).  So to "maintain safe operations, Phillips 66 determined operators must have a current working knowledge of the unit's operations in the field (i.e., the unit's outside jobs) to be effective and successful console operators."  (*Id.*).

In short, according to Phillips 66, Hargett's inability to work the outdoor jobs will have two consequences: Hargett will (1) lose certifications required to perform the outdoor jobs and (2) be unable to fill in for outdoor operators if they are absent or reassigned.

Starting with the first, Phillips 66 argues that "[t]he inability to . . . maintain job certifications disqualify an individual from being a qualified individual under the ADA." (Dkt. No. 26 at 15).  In other words, the fact that Hargett cannot maintain an internally mandated certification that Phillips 66 requires is enough to prove Hargett is unqualified for the console operator position.

Despite Phillips 66's insistence that the caselaw on this point is "clear," it has not provided persuasive legal authority to support that position.  (*See id.* at 15–16).  The unreported cases Phillips 66 cites hold that an individual is not qualified if they cannot (or do not) physically attend work or are completely disabled.  (*See id.*).[6]  And the one case Phillips 66 cites regarding certification, *Alexis v. Dallas Independent School District*, is distinguishable.  In *Alexis*, a school fired a teacher whose teaching permit expired at the

---

6    Citing the following: *Salinas v. Exxon Mobil Corp.*, No. 4:04-CV-01369, 2005 WL 2122065, at *6 (S.D. Tex. Aug. 31, 2005) ("Common sense dictates, and the Fifth Circuit has recognized, that appearing for work is an essential element of most jobs."); *Villarreal v. Tropical Tex. Behav. Health*, No. 20-40782, 2021 WL 3525023, at *5 (5th Cir. Aug. 10, 2021) (per curiam) ("[T]he inability (or refusal) to attend work disqualifies one from being a 'qualified individual with a disability' under the ADA." (quoting *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir. 1996)); *Dorsey v. Boise Cascade Co.*, 611 F.App'x 212, 213–14 (5th Cir. 2015) (per curiam) ("A person who cannot do any work, let alone the particular work required for the job from which he was discharged, is not a 'qualified individual' under the ADA."); *Kessell v. Mega Life & Health Ins.*, No. 3:03-CV-02788, 2005 WL 383700, at *6 (N.D. Tex. Feb. 15, 2005) (plaintiff was not qualified because she was receiving long-term disability and social security disability benefits, both of which require certification of physical inability to perform one's job).

end of the year, "after which he was not authorized to teach in the State of Texas, and his employment terminated according to the terms of his contract." No. 3:03-CV-00858, 2004 WL 1923879, at *2 (N.D. Tex. Aug. 26, 2004). While *Alexis* and similar cases[7] stand for the proposition that failing to meet a legal requirement of a job renders an employee unqualified for a position, Phillips 66 has cited no case law—and this Court has not found any—that supports Phillips 66's position that failing to obtain a certification that is not legally required automatically renders an employee unqualified under the ADA. In fact, some commentators have reached the opposite conclusion, opining that "[a]n employee who fails a job qualification standard may still be found 'qualified' for the job if that standard exceeds the '*essential functions*' of the job." Rosen, *supra*, at ch. 4-A § 4:601 (emphasis in original).

*Alexis* and related cases simply stand for the uncontroversial proposition that an employee who cannot perform an essential job function—whether due to a lack of legally required certification or any other reason—is not a "qualified individual" under the

---

[7]    *See Williams v. J.B. Hunt Transp., Inc.*, 826 F.3d 806, 812 (5th Cir. 2016) (employee failed to establish he was qualified for job because "he lacked the [Department of Transportation] certification required by federal law"); *Turner v. BNSF Ry. Co.*, No. 4:23-CV-00681, 2023 WL 9052248, at *4 (N.D. Tex. Dec. 22, 2023) (railroad conductor did not prove he was a "qualified individual" after failing certification under Federal Railroad Safety Act regulations); *Comacho v. R+L Carriers Shared Servs., LLC*, No. 4:22-CV-01248, 2023 WL 5615468, at *2 (S.D. Tex. Aug. 30, 2023) (truck drivers must comply with all Department of Transportation "regulations governing commercial motor vehicle drivers" to qualify for ADA protection); *Chumney v. Glasscock Cnty. Indep. Sch. Dist.*, No. 6:17-CV-00037, 2019 WL 10733241, at *2 (N.D. Tex. Mar. 6, 2019) ("Plaintiff's certification would not satisfy the Texas Essential Knowledge and Skills (TEKS) for the Technology Applications course, as required under Texas law. . . it was determined that she was not properly qualified or certified for the position."); *Preston v. Victoria Indep. Sch. Dist.*, No. 6:09-CV-00020, 2010 WL 2735729, at *12 (S.D. Tex. July 12, 2010) ("VISD has presented evidence that [Plaintiff] was not offered the position . . . because she was not certified to teach science at that grade level").

23

ADA.  Applying that proposition to this case, Hargett's inability to obtain the certification to perform outdoor tasks only disqualifies Hargett from ADA protection if being able to perform those outdoor tasks is determined to be an essential function of the job.

The relevant consequence of Hargett's inability to perform the outdoor jobs is that he cannot fill in for outdoor employees who are absent or reassigned.  "Filling in for other [employees]" might not be an essential job function.  *Barber v. Nabors Drilling USA, Inc.*, 130 F.3d 702, 707 (5th Cir. 1997).  And Phillips 66 has not presented sufficient summary-judgment evidence to conclude that filling in for outdoor employees is "essential" as a matter of law.  Phillips 66 has not discussed how often console operators, or Hargett specifically, fill in for outdoor employees or what happens if Hargett or console operators generally cannot fill in for outdoor employees.  What's more,  Hargett has not filled in for an outdoor employee in over ten years, (Dkt. No. 26 at 7, 9, 12); (Dkt. No. 26-2 at 64), and Phillips 66 has not asserted that this was burdensome.  In fact, the evidence shows that "[Phillips 66] would just cover it off another shift most of the time" or have one of the outdoor employees "work two jobs."  (Dkt. No. 26-2 at 25).  The summary judgment record does not establish that this affected Phillips 66's operations to the point that filling in for outdoor employees would be considered an "essential" function of the console operator job.  Therefore, this factor weighs against a finding that Hargett's disability disqualified him from the ADA's protection.

### c.    The work experience of past incumbents in the job

As for the next factor, the work experience of past incumbents in the job, the summary judgment record fails to establish that any previous console operator in

Hargett's position was required to work the outside jobs. Both Parties agree that working the outdoor jobs was neither required nor expected of console operators until the refinery updated "the Training Process and implemented Revision 9" in 2020. (Dkt. No. 26 at 9). Hargett did not fill in for an outdoor employee in over ten years before he was put on leave. (*Id.* at 7, 9, 12); (Dkt. No. 26-2 at 64). This suggests that working the outdoor position is not an essential job function of the position. *See LHC Grp.*, 773 F.3d at 698 ("The inquiry into whether a particular function is essential initially focuses on whether the employer *actually requires* employees in the position to perform the functions that the employer asserts are essential." (quoting Interpretive Guidance on Title I of the Americans With Disabilities Act, 29 C.F.R. pt. 1630, app. § 1630.2(n)) (emphasis in original)); *Huffman v. Turner Indus. Grp., LLC*, No. 2:12-CV-01061, 2013 WL 2244205, at *12 (E.D. La. May 21, 2013) (determining that fact issue existed as to whether plaintiff was qualified because he performed the same job for six years without incident).

> d.    The current work experience of incumbents in similar jobs

Hargett has submitted summary-judgment evidence that other console operators are not required to remain certified for the outdoor jobs. (*See* Dkt. No. 30-2 at 2–3); (Dkt. No. 30-3 at 2–3). Hargett has submitted declarations averring that at least three other console operators are not compliant with the requirement that console operators work the outdoor jobs twelve hours every six months. (*See* Dkt. No. 30-2 at 2–3); (Dkt. No. 30-

3 at 2–3).[8]  Therefore, this factor weighs against finding that the outdoor jobs are an

"essential" function of the console-operator position.[9]

    e.    <u>Hargett's Social Security application and medical provider's</u>
                 <u>statements</u>

Phillips 66 makes one more argument on Hargett's qualifications: It contends that

Hargett's Social Security disability application and his medical provider's statements

prove he was not qualified for the job.  (Dkt. No. 26 at 12–16); (Dkt. No. 32 at 2–4).  The

Court disagrees.  These documents add nothing new to Phillips 66's argument.  Hargett

applied for Social Security benefits because Phillips 66 determined he was unqualified

for his position.  (Dkt. No. 30-2 at 3).  But this is distinct from the legal question of whether

Hargett could perform the "essential functions" of the job, as discussed above.  *See supra*

Section (III)(B)(1)(a)–(d).

Furthermore, nothing in Hargett's Social Security application or medical

provider's statements contradicts his arguments before this Court.  In fact, Hargett

---

    8    While comparators in an intentional-discrimination claim must share the same job, unit, and supervisor to prove that the disabled employee's treatment was due to their *disability* rather than another factor—such as a different supervisor's temperament—this factor in the "essential functions" inquiry looks only to whether the *job* was the same across comparators.  *See, e.g.*, *Cuellar v. GEO Grp., Inc.*, No. 22-50135, 2023 WL 4535079, at *3 (5th Cir. July 13, 2023) (per curiam) (considering experience of other employees with same job without reference to unit or supervisor); *Credeur v. Louisiana*, 860 F.3d 785, 795 (5th Cir. 2017) (same); *Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 683 (5th Cir. 1996) (same).  Here, as Phillips 66 acknowledges, these three employees held the same job as Hargett, (Dkt. No. 32 at 5), making them probative in considering what responsibilities of that job are "essential."

    9    Absent this evidence—which Phillips 66 objects to, *see supra* Section (II)(A)(1)–(2)—this factor would not apply as there would be no evidence on whether console operators perform the outdoor jobs.  Therefore, this factor would favor neither side.  As three of the four factors would still favor Hargett's position that the outdoor jobs are not essential, the Court would reach the same conclusion even if these statements were excluded from the analysis.

concedes that he could not perform the outdoor jobs due to his disability, and his Social Security application confirms this.  (*See* Dkt. No. 26-30 at 1–7).  He indicated that he needed a walker, couldn't stand for long periods, and required assistance when he fell.  (*Id.*).  His medical provider corroborated these limitations, noting that Hargett could not climb stairs or ladders or work at heights.  (Dkt. No. 26-26 at 1).  But these facts are undisputed and have already been considered.

The central issue thus remains: If performing the outdoor jobs is an essential function of the position, Hargett is not qualified under the ADA; if they are not essential, he is qualified.

\* \* \*

In sum, although Phillips 66 argues that the outdoor jobs are essential because they are (1) required under the current "Operations Training Process" Manual, (Dkt. No. 26-10 at 12–13), and (2) required for console operators to maintain their certification, after reviewing the factors set forth in the regulations, Phillips 66 has not met its burden of establishing this as a matter of law.  This conclusion is in harmony with the Fifth Circuit's guidance that

> the most critical function of the jury in ADA cases [is] the injection of some indispensable common sense in the determination of what is or is not an essential function.  When a statutory scheme such as the ADA necessitates some seemingly arbitrary line-drawing exercise, courts of law do well to refer the question to the jury . . . .
>
> A highly deferential standard is especially appropriate with regard to the jury's determination of what the essential functions of the job are, since the evidence, as in this case, most often consists of post hoc descriptions of what the

> employee was expected to do and what he actually did, which
> necessarily requires the jury to judge the credibility of
> witnesses and the veracity of their testimony.

*Barber*, 130 F.3d at 707; *LHC Grp.*, 773 F.3d at 698 ("Fact-finders must determine whether a function is 'essential' on a case-by-case basis."). Here, a reasonable jury could find that performing the outdoor jobs was not an "essential" part of being a console operator at Phillips 66. As a result, Phillips 66 has not established that Hargett is not a "qualified individual" under the ADA as a matter of law.

## C. DISPARATE-TREATMENT CLAIM

"'Disparate treatment' is *intentional* discrimination against one or more persons on prohibited grounds; i.e., treating similarly situated individuals differently in their employment *because of* a protected characteristic." Rosen, *supra*, at ch. 2-G § 2:355 (emphasis in original) (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977)). "Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Int'l Bhd. of Teamsters*, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15.

There are two methods of proving intentional discrimination: direct evidence and indirect or circumstantial evidence. Direct evidence is evidence that, if believed, proves discriminatory motive "without inference or presumption." *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993). Indirect or circumstantial evidence, on the other hand, invokes the *McDonnell Douglas* analysis.[10] *King*, 2024 WL 4132676, at *5.

---

[10]   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

In his Amended Response to Defendant's Motion for Summary Judgment, (Dkt. No. 30), Hargett does not claim to have direct evidence of discrimination, (*see* Dkt. No. 30 at 9–11), so the Court applies the burden-shifting framework established in *McDonnell Douglas* to Hargett's disparate-treatment claim.

Under *McDonnell Douglas*, "a plaintiff must first establish a prima facie case of discrimination," which requires showing that the plaintiff (1) had a disability, (2) was qualified for the job, and (3) was subject to an adverse employment decision on account of his disability. *King*, 2024 WL 4132676 at *4–5 (quoting *LHC Grp.*, 773 F.3d at 697). If the plaintiff makes a prima facie case of discrimination, "[t]he burden then shifts to the employer to 'come forward with a legitimate, nondiscriminatory . . . reason for its action.'" *Id.* at *5 (quoting *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 304 (5th Cir. 2020)). And if the employer is able to do so, then "the employee must . . . demonstrate that the proffered reason is a pretext for retaliation [or discrimination].'" *Id.* (quoting *Lyons*, 964 F.3d at 304). To meet this final burden, the employee "must 'produce evidence from which a jury could conclude that [the employer's] articulated reason is pretextual.'" *Id.* (alteration in original) (quoting *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 342 (5th Cir. 2019)).

### 1.   Hargett's Prima Facie Case

The Court has already addressed the first two elements of Hargett's prima facie case, *see supra* Section (III)(B), leaving only the question of whether Hargett suffered an adverse employment decision on account of his disability. The Parties do not dispute that Phillips 66 made employment decisions about Hargett because of Hargett's disability. They agree that Phillips 66 removed Hargett from his job as a console operator,

forced him to go on FMLA leave followed by short- and long-term leave, revoked his job certifications, and made clear that Hargett will be terminated once his leave is up (though he technically remains "employed" for the moment). (Dkt. No. 30-2 at 3); (Dkt. No. 26 at 12). They disagree, however, on whether these decisions constitute "adverse" employment decisions. (*Compare* Dkt. No. 26 at 17–18 *with* Dkt. No. 30 at 11–12).

Even if such actions constitute adverse employment decisions, the Court finds that summary judgment on Hargett's disparate-treatment claim is nevertheless appropriate because (1) Phillips 66 has proffered a legitimate or nondiscriminatory reason for these actions, and (2) Hargett has not met his burden of showing that the reason was merely a pretext for discrimination. *See also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993) (referring to "minimal requirements" of *McDonnell Douglas* prima facie case).

### 2.    Phillips 66's Legitimate Nondiscriminatory Reasons

Phillips 66 explains that it (1) removed Hargett from his job as console operator and placed him on leave because Hargett could not comply with Phillips 66's policy that a console operator be able to perform the outside jobs to work on the console, (Dkt. No. 26 at 7); (2) revoked Hargett's operator job certifications because Hargett was absent for longer than six months and had not worked each station for a minimum of twelve hours every six months to remain certified as a console operator, (*Id.* at 8); and (3) intended to terminate Hargett because company policy only permits employees to stay on leave for twenty-four months, so if Hargett does "not return[] to work by the end of the 24-month period," company policy will require his termination, (*Id.*). In short, Phillips 66 asserts

that each adverse employment action results from company policy—not Hargett's disability.

Phillips 66's proffer of its neutral company policies "plainly satisfie[s] its obligation under *McDonnell Douglas* to provide a legitimate, nondiscriminatory reason" for its conduct. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53–55, 124 S.Ct. 513, 520, 157 L.Ed.2d 357 (2003) (holding an adverse employment action "can, in no way, be said to have been motivated by [employee's] disability" when company applied "a neutral, generally applicable" policy); *see also Bd. of Trs. of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 n.2, 99 S.Ct. 295, 296 n.2, 58 L.Ed.2d 216 (1978) (per curiam) (noting that an employer's burden, like a prima facie case, is not onerous and is met if employer "simply explains what he has done or produc[es] evidence of legitimate nondiscriminatory reasons" (alteration in original) (internal quotations omitted)).

### 3.    Hargett's Evidence of Pretext

Because Phillips 66 articulated a legitimate nondiscriminatory reason, "the only relevant question" before the Court is "whether there [is] sufficient evidence from which a jury could conclude that [Phillips 66] did make its employment decision based on [Hargett's] status as disabled despite [Phillips 66's] proffered explanation." *Raytheon*, 540 U.S. at 53, 124 S.Ct. at 520. Therefore, the burden shifts back to Hargett to "'produce evidence from which a jury could conclude that [Phillips 66's] articulated reason is pretextual.'" *King*, 2024 WL 4132676, at *5 (quoting *Nall*, 917 F.3d at 342).

Pretext may be proven through comparator evidence—evidence showing the employer treated similarly situated individuals more favorably than the plaintiff in

comparable circumstances.  *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825.  The critical factor is that the compared employees must be similarly situated in *all relevant respects* to the plaintiff.  For example, in *Alkhawaldeh v. Dow Chemical Co.*, the plaintiff's failure to identify at least one non-Jordanian Muslim Arab who had received the lowest job rating, had completed a performance improvement plan, but was not fired as he was, meant that the plaintiff had failed to identify a similarly situated comparator.  851 F.3d 422, 426–27 (5th Cir. 2017).  Similarly, in *Saketkoo v. Administrators of Tulane Educational Fund*, the Fifth Circuit declined to find a female plaintiff's comparators sufficient to prove pretext when she "failed to present evidence that any male physicians shared her research responsibilities, section assignments, historical performances, or other attributes that would render them similarly situated."  31 F.4th 990, 998–99 (5th Cir. 2022).

Hargett is a console operator at Phillips 66's Sweeny Refinery.  (Dkt. No. 30-2 at 2).  He works in the Coker unit and is supervised by the "Crude/Coker Business Team Leader Joseph Lee Niemann."  (*Id.*).  Therefore, to satisfy the "similarly situated" prong, Hargett must identify at least one nondisabled console operator employee in Sweeny's Coker unit, supervised by Niemann, who was treated more favorably than Hargett.  *See Alkhawaldeh*, 851 F.3d at 426–27.

Hargett's comparators fail to meet this standard.  Hargett has offered evidence of four other employees: Clayton Bock, Ashley Pettry, Dennis Chavana, and Gary White.  (Dkt. No. 30 at 8–9, 12).  Clayton Bock has a different job than Hargett: Bock is a Shift Lead, (Dkt. No. 30-4 at 2), while Hargett is a console operator, (Dkt. No. 30-2 at 2).  Therefore, Bock is not a proper comparator.  It is unclear if the remaining employees work

in the same group or unit as Hargett or have the same supervisor.  The declarations about the employees state that they worked in the "Utilities group" or "Utilities Unit Department," (Dkt. No. 30-3 at 2), while Hargett worked in Sweeny's "Coker unit," (Dkt. No. 30-2 at 2).  Phillips 66 argues that this means the comparators worked in different units with different supervisors, (Dkt. No. 32 at 5), while Hargett's Amended Response to Defendant's Motion for Summary Judgment states that the comparator employees "work in the same group," (Dkt. No. 30 at 12).  Assuming that Hargett meant the comparators work in the same group *as him*, Hargett's summary-judgment evidence is insufficient to support his assertions that the employees worked in the same unit as Hargett.  Hargett's declaration does not support that conclusion, (*see* Dkt. No. 30-2), and the only other declaration aligns with Phillips 66's interpretation, (*see* Dkt. No. 30-3 at 2).

Even if the Court assumed that "Coker unit" and "Utilities unit" meant the same thing, Hargett has provided no evidence that Niemann—Hargett's supervisor—supervised these individuals.  Consequently, the summary-judgment evidence does not establish a fact issue as to whether these potential comparators are "similarly situated" individuals.  Hargett therefore "cannot prove that he was treated less favorably than others 'similarly situated' outside of his protected class."  *Alkhawaldeh*, 851 F.3d at 427.

## D.   REASONABLE-ACCOMMODATION CLAIM

"If the employee has provided notice to the employer of their disability, resulting limitations, and a requested accommodation, the employer's failure to provide a reasonable accommodation for the disability provides the required nexus between the disability and the alleged discrimination.  No evidence of discriminatory intent is

necessary." Rosen, *supra*, at ch. 4-A § 4:784.1; *see King*, 2024 WL 4132676, at *4 (quoting *Feist*, 730 F.3d at 452). Therefore, a prima facie claim for failure to accommodate requires a plaintiff to show that (1) he is a qualified individual with a disability; (2) the employer knew the disability and its relevant limitations; and (3) the employer failed to make reasonable accommodations for these known limitations. *King*, 2024 WL 4132676, at *4 (quoting *Feist*, 730 F.3d at 452). The Court has already addressed the first element. *See supra* Section (III)(B).

Employees must establish that their employer knew of their disability and its relevant limitations. *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 163–64 (5th Cir. 1996); *see also Dooley v. Parks & Recreation for Par. of E. Baton Rouge*, 433 F.App'x 321, 326 (5th Cir. 2011) (per curiam). Phillips 66 argues that Hargett's failure-to-accommodate claim fails because he "never requested any accommodation from Phillips 66." (Dkt. No. 32 at 7). This objection fails because the summary-judgment evidence viewed in the light most favorable to Hargett supports a finding that Hargett requested an accommodation under the ADA.

"It is the plaintiff's burden to request reasonable accommodations.'" *Clark*, 952 F.3d at 587 (quoting *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007)). To request an accommodation, "the employee does not have to mention the ADA or use the phrase 'reasonable accommodation.' Plain English will suffice." *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 621 (5th Cir. 2009).

As the EEOC guidelines explain, it is sufficient that the employee has alerted his supervisor that he has a disability and explained the resulting limitations. *See* EEOC

"Requesting Reasonable Accommodation" *in* Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the ADA (Oct. 17, 2002), *available a*t http://www.eeoc.gov/policy/docs/accommodation.html    [https://perma.cc/XMX4-VSP4].  The guidelines say that, generally,

> the individual with a disability—who has the most knowledge about the need for reasonable accommodation—must inform the employer that an accommodation is needed.
>
> However, an employer should initiate the reasonable accommodation interactive process without being asked if the employer: (1) knows that the employee has a disability . . . .

*Id.* (internal citations omitted).  For example:

> Example A: An employee tells her supervisor, "I'm having trouble getting to work at my scheduled starting time because of medical treatments I'm undergoing." This is a request for a reasonable accommodation.
>
> . . .
>
> Example C: A new employee, who uses a wheelchair, informs the employer that her wheelchair cannot fit under the desk in her office. This is a request for reasonable accommodation.

*Id.*  Therefore, "[t]o prove discrimination, an employee must show that the employer knew of such employee's substantial physical or mental limitation."  *Taylor*, 93 F.3d at 163.

Here, Phillips 66 concedes that it had notice of Hargett's disability and its relevant limitations.  On August 5, 2021, an Occupational Health Nurse "sent an email to Niemann outlining Hargett's physical work restrictions" and "ask[ing] whether Hargett's physical work restrictions could be accommodated."  (Dkt. No. 26 at 11); (*see also* Dkt. No. 26-13 at 2) ("[I]f you are able to accommodate Mr. Hargett, please provide . . . a list of his job

duties . . . ."). Phillips 66 also acknowledges that Niemann responded to the email, affirming that he knew of and understood Hargett's disability and resulting physical limitations. (Dkt. 26 at 11); (*see also* Dkt. No. 26-13 at 2) ("Based on these restrictions, I cannot accommodate any restricted duty for [Hargett]. His restrictions prevent him from all duties associated with the operator position, including working [the console job]."); (Dkt. No. 26-18 at 2). Therefore, Hargett has met his summary-judgment burden of establishing that "'the disability and its consequential limitations were known by the covered employer'" as required to state a failure-to-accommodate claim. *See King*, 2024 WL 4132676, at *4 (quoting *Feist*, 730 F.3d at 452).

The final element in a failure-to-accommodate claim is showing that "the employer failed to make reasonable accommodations for such known limitations." *Id.* The employee bringing a failure to accommodate claim "need only show that an 'accommodation' seems reasonable on its face." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401, 122 S.Ct. 1516, 1523, 152 L.Ed.2d 589 (2002). After "the plaintiff has made this showing, the defendant/employer then must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *Id.* at 402, 122 S.Ct. at 1523; 42 U.S.C. § 12112(b)(5)(A).

Here, Hargett argues that Phillips 66 should have accommodated his disability by "permitting him to continue to perform his position as a console operator" without requiring him to work the outside jobs. (Dkt. No. 30 at 11). Hargett has submitted evidence that Phillips 66 considered and ultimately dismissed this potential accommodation. (*See* Dkt. No. 30-4 at 2–3). According to one declaration, Hargett's

supervisor and an Operations Excellence specialist—Scott Lindsey—stated that Phillips 66 would give Hargett "an exemption" from the outside operator positions "because of his physical restrictions." (*Id.*).

Hargett has also shown that this accommodation is "reasonable on its face." *US Airways*, 535 U.S. at 401, 122 S.Ct. at 1523; *see Taylor*, 93 F.3d at 162 ("'The term "reasonable accommodation" may include . . .job restructuring'" (quoting 42 U.S.C. § 12111(9)). As discussed above, *see supra* Section (III)(B)(1)(b)–(c), Hargett has not filled in for an outdoor employee in over ten years, (Dkt. No. 26 at 7, 9, 12); (Dkt. No. 26-2 at 64), and there is no assertion that this was an undue burden. The evidence suggests that "[Phillips 66] would just cover it off another shift most of the time" or have one of the outdoor employees "work two jobs." (Dkt. No. 26-2 at 25). Thus, Hargett has shown that a potential accommodation was known to the employer and is facially reasonable. Because Phillips 66 has not shown that the proposed accommodation would cause "undue hardship," the Court finds that there is a genuine issue of material fact about whether Phillips 66 failed to accommodate Hargett's disability. *US Airways*, 535 U.S. at 402, 122 S.Ct. at 1523; 42 U.S.C. § 12112(b)(5)(A).

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** Phillips 66's Motion for Summary Judgment. (Dkt. No. 26). The Court **GRANTS** summary judgment on Hargett's intentional discrimination claims under the American Disabilities Act and **DENIES** summary judgment on Hargett's failure-to-accommodate

claims.  The Court **DENIES** Phillips 66's Motion to Strike Plaintiff's Summary Judgment

Evidence.  (Dkt. No. 31).

It is SO ORDERED.

Signed on January 22, 2025.

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**